IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Civil Action No. 04-cv-01545-PSF-CBS

BRADFORD K. HENDERSON,

      Plaintiff,

v.

UNITED PARCEL SERVICE, INC.,

      Defendant.

---

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

      This employment discrimination matter comes before the Court on the Motion for

Summary Judgment (Dkt. # 50) filed by Defendant United States Parcel Service, Inc.

("UPS") on October 12, 2005 together with its supporting brief (Dkt. # 51) and exhibits

thereto labeled A through M (collectively, "Defendant's Motion").  Plaintiff filed his

response in opposition to the motion on October 31, 2005 (Dkt. # 53), together with

exhibits numbered 1 through 16.  UPS filed its reply brief on December 14, 2005 (Dkt.

# 60), together with additional exhibits labeled N through U.  The Final Pretrial Order

was entered on February 23, 2006 (Dkt. # 76).  The case is set for a five-day trial to a

jury commencing June 26, 2006.  The matter is ripe for determination.

## I.    BACKGROUND

      Plaintiff Bradford Henderson, an African-American male, began working at

UPS on or about May 26, 1998 in the position of "part-time preloader."  (Final Pretrial

Order at 9-10).  In 2000, plaintiff transferred to the position of "twilight sorter."  *Id.* at 10.

In February 2001, plaintiff applied for and was promoted to the position of human resource specialist. *Id.* In October 2001, plaintiff was promoted to a "[h]ub supervisor position." *Id.* Henderson apparently worked as a hub supervisor from October 2001 until at least September 2005.[1]

Plaintiff alleges generally that during the period December 2002 through September 2003 defendant UPS, through its hub manager, its hub divisional manager and its human resources representatives, engaged in employment practices that constituted racial harassment and disparate treatment of plaintiff due to his race (Amended Complaint at ¶ 12).

Plaintiff specifically alleges that the hub manager, his immediate supervisor who was a white female, used loud, profane and abusive language towards plaintiff while treating white supervisors with courtesy and respect (*id.* at ¶ 13); that she "invaded [plaintiff's] zone of privacy, getting in his face and shouting at him with less than 12 inches between them" (*id.* at ¶ 14); that she often behaved in a confrontational manner, challenging decisions plaintiff made while accepting without question the same decisions made by white supervisors (*id.* at ¶ 15); that she often shouted at plaintiff or attempted to interfere with his taking corrective actions against white subordinates

---

[1]   Plaintiff states in his response brief that on September 7, 2005 he was "discriminatorily discharged" for pursuing this litigation and on September 13, 2005 he filed a charge with the Equal Employment Opportunity Commission ("EEOC") regarding his termination (Plaintiff's Response at 23-4). That charge is not before the Court in this case. Defendant has submitted extensive argument that plaintiff may have falsified his employment application, perhaps laying the groundwork for claiming that he would be subject to termination for having done so (Defendant's Motion at 2-4). As the termination claim is not before the Court at this time, the charges of resume fraud are not considered pertinent to this motion.

(*id.* at ¶ 16); that in December 2002 she yelled and screamed at plaintiff regarding the manner he assigned work, while white supervisors made identical assignments without any negative consequences (*id.* at ¶ 17); that in the Spring of 2003, she turned out the lights during a meeting and commented that she could not see plaintiff, yet that she said to plaintiff "I know where you are because I can see your eyes" (*id.* at ¶ 18), and that in August 2003 she called plaintiff into her office and said "I can fire your Black ass anytime I want." (*id.* at ¶ 19).

Plaintiff further alleges that on or about August 7, 2003, he was transferred from the Northwest Wall to the South Wing, an area where the work was unfamiliar to him and more difficult, although apparently still continuing in the position of hub supervisor under the same hub manager (*id.* at ¶ 20).  Plaintiff alleges that he was transferred due to his race, and believes that other managers stated (at a meeting he apparently did not attend) that the transfer was made to get plaintiff to quit (*id.* at ¶¶ 21-22).

Plaintiff alleges that on several occasions he told his hub manager that he did not observe her treating the other supervisors the way she treated him and he inquired if it was due to his race.  He alleges that he would complain to other managers about her conduct and state that he felt he was being discriminated against because of his race (*id.* at ¶¶ 23-24).  He further alleges that after making the complaints the hub manager's behavior would improve for a few weeks, but then she would resume her abusive behavior towards him (*id.* at ¶ 25).

He further specifically alleges that on September 23, 2003[2], the hub manager was speaking to him in a loud, profane and abusing manner when he attempted to walk away.  He alleges the hub manager grabbed his right arm, and stated he could not walk away when she was talking to him (*id.* at ¶¶ 26-27).

He further alleges that after the incident of September 23, 2003, he apparently complained to his manager and the divisional hub manager about the "assault," stating he felt the conduct constituted an assault and that it was racially based (*id.* at ¶ 32).  Plaintiff also alleges that on September 27, 2003, he filed a complaint with the Commerce City police regarding the alleged assault; that on October 2, 2003 he formally complained about the incident on the UPS "help line" alleging racial discrimination and hostile environment; and that on December 3, 2003, he filed a charge of employment discrimination with the EEOC (*id.* at ¶¶ 35-37).

Plaintiff further alleges that on or about December 12, 2003, he was placed on paid suspension pending investigation as a result of a "disagreement" that occurred on December 10, 2003 between plaintiff and a company representative in connection with a company program involving the distribution of holiday turkeys (*id.* at ¶¶ 38-41).  Plaintiff asserts that he complained that the "turkey incident" was racially motivated in that different rules were applied to white employees in connection with the distribution of the turkeys (*id.* at ¶ 42).  He further alleges that although he was removed from suspension, he was required to draft a written statement "eliminating any accusations

---

[2]   The Amended Complaint actually alleges the date as "September 23, 200**4**" (emphasis added), but it is apparent from other allegations that this is a typographical error.

of racial bias on the persons involved in the 'turkey incident'" and that he suffered

ridicule by fellow workers as a result of the incident (*id.* at ¶¶ 43-44).

After filing two charges of discrimination with the EEOC, one on December 3, 2003

and the other on January 24, 2004, and receiving notice of right to sue, plaintiff timely

filed his original complaint on July 27, 2004, and an amended complaint which was

allowed for filing by order dated November 22, 2004.

## II.    PLAINTIFF'S AMENDED COMPLAINT

Based on the above allegations, plaintiff asserted five claims for relief against

the defendant employer in his original complaint, and added a sixth claim for relief

when he filed the amended complaint, which is now the operative pleading.

Count I of plaintiff's Amended Complaint essentially avers that plaintiff was

subjected to a racially discriminatory hostile work environment and racial harassment

in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981 (*id.* at ¶ 29).

Count II asserts retaliation by the employer in violation of Title VII and 42 U.S.C. §

1981 after plaintiff reported and complained about the September 23, 2003 incident.

Count III alleges that plaintiff was subjected to discrimination in the conditions of his

employ-ment, or disparate treatment, on account of his race in violation of Title VII and

42 U.S.C. § 1981.  Count IV alleges common law battery resulting from the September

23, 2003 incident, and Count V alleges negligent supervision by UPS of the night hub

manager.

Count VI of the Amended Complaint, added in November 2004, alleges three

separate acts of retaliation by the employer after plaintiff filed his original complaint in

this case on July 27, 2004, including a denial of a transfer to a UPS facility in North

Carolina, refusal to extend him an invitation to a Board of Directors' luncheon held on

August 11, 2004 and placing him on a "not to admit" list to the luncheon, and denial of

access to the plant on August 22, 2004 (*id.* at ¶¶ 65-73).  Plaintiff's Amended Complaint

seeks injunctive relief against discriminatory employment practices, compensatory and

punitive damages, and attorneys' fees.

## III.   DEFENDANT'S MOTION

Defendant argues that it is entitled to summary judgment on all six of plaintiff's

claims for relief.  With respect to the claims of hostile work environment and racial

harassment, defendant asserts that the incidents alleged by plaintiff are not sufficiently

"severe or pervasive" under controlling law to amount to violations of Title VII or 42

U.S. § 1981 (Defendant's Motion 9-12).  With respect to his claims of racial

discrimination in the terms and conditions of his employment, Defendant argues that

plaintiff has not established a *prima facie* case of because his allegations do not

demonstrate that he suffered adverse employment actions (*id.* at 13-15) and,

alternatively, because he can not show that any action taken by the employer was for a

pretextual reason (*id.* at 15-17).  Defendant also contends that plaintiff's claims of

retaliation must fail because plaintiff can not show any adverse employment action

taken after he complained of racial discrimination (*id.* at 17-19), nor can he show that

any action taken had a "causal connection" to his engaging in protected activity (*id.* at

19-20).  Finally, defendant asserts that plaintiff's common law battery and negligent

supervision claims are preempted by state law workers' compensation statute (*id.* at 20-22).

## IV.   STANDARD OF REVIEW

The purpose of a summary judgment motion is to assess whether a trial is necessary.  *White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir. 1995).  In other words, there "must be evidence on which the jury could reasonably find for the plaintiff."  *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995), *cert. denied*, 516 U.S. 1160 (1996), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A court grants summary judgment for the moving party only where there is no genuine issue as to any material fact in the pleadings, depositions, answers to interrogatories, admissions and affidavits.  F.R.Civ.P. 56(c).  When applying this standard, a court must view the factual record in the light most favorable to the non-movant.  *Applied Genetics Int'l., Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## V.   ANALYSIS

As Defendant's Motion sets forth various grounds as to the various claims asserted by plaintiff, this Order separately addresses each of plaintiff's claims and defendant's related arguments.

A.     Plaintiff's Claims of Racially Hostile Work Environment

Claims of racially hostile work environment are actionable under Title VII. *Bolden v. PRC, Inc.*, 43 F.3d 545, 550 (10th Cir. 1994), citing *Griffith v. State of Colorado, Div. of Youth Serv.*, 17 F.3d 1323 (10th Cir. 1994) and *Hicks v. Gates Rubber Co.*, 928 F.2d 966 (10th Cir. 1991). In order to demonstrate a racially hostile work environment or racial harassment claim, the plaintiff must make a showing that (1) he is member of a protected class, (2) the harassment was pervasive and severe enough to alter the terms, conditions, or privilege of employment, and (3) the harassment stemmed from racial animus. *Bolden*, 43 F.3d at 551. Whether conduct is sufficiently severe or pervasive to constitute actionable harassment depends on all the circumstances. These may include (1) the frequency of the discriminatory conduct, (2) its severity, (3) whether it is physically threatening or humiliating as opposed to a "mere" offensive utterance, and (4) whether the conduct unreasonably interferes with an employee's work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

Workplace conduct only constitutes an impermissible racially hostile work environment if it is racial or stems from racial animus. *Bolden*, 43 F.3d at 551. "General harassment if not racial or sexual is not actionable." *Id.* Plaintiff must show "more than a few isolated incidents of racial enmity." *Hicks*, 833 F.2d at 1412. "Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Bolden*, 43 F.3d at 551.

As indicated above, plaintiff's claims of racially hostile work environment and racial harassment stem primarily from the work-related relationship between plaintiff

8

and his hub manager, a white female employee named Kim Seville.  Seville apparently became plaintiff's manager sometime in 2002, and plaintiff has alleged that Seville's harassing conduct commenced in December 2002 and continued until September 24, 2003.  (*See* EEOC Charge dated December 3, 2002, Exhibit L to Defendant's Motion).

Of significance is that the majority of the events of which plaintiff complains arose in the context of Seville reprimanding him for his work performance or workplace conduct.  To be sure, Seville's asserted use of profanity and abusive language may have been offensive to plaintiff in the workplace, but having a contentious relationship with one's supervisor does not rise to the level of an abusive and hostile work environment.  *See Trujillo v. Univ. of Colo. Health Science Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998).  As the court stated, "federal law does not guarantee a utopian workplace, or even a pleasant one . . . [P]ersonality conflicts between employees are not the business of the federal courts," quoting from *Vore v. Indiana Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994).  Or to summarize and place in a race context what the Tenth Circuit stated in *Stahl v. Sun Microsystems*, 19 F.3d 533, 538 (10th Cir. 1994), which analyzed a gender-based hostile work environment claim, if the nature of an employee's environment, however unpleasant, is not due to his race, he has not been the victim of race discrimination as a result of that environment.

However, some of the alleged incidents plaintiff complains about do have an overtone of racial animus.  In support of his claims of racial harassment, plaintiff testified that beginning in the spring of 2003, on two or three different occasions during presort meetings with other supervisors, Seville would turn off the light and say to him, the only person in the room with a dark complexion, "Brad, where are you?  We can't

see you" and when the other employees started laughing she would say "oh I can see you, I can see your eyes." (Henderson Deposition, Exhibit 1 to Plaintiff's Response and Tab A to Defendant's Motion, at 79, 82-3, 85).[3]  Apparently these incidents occurred during intervals of three to four weeks over a short period of time.  *Id.* at 86-87.

In August 2003, plaintiff was late with a report.  When explaining to Seville why the report was late, Seville allegedly told him to get the "fuck" out of her "goddamn" office.  Plaintiff replied that "if he were doing such a bad job, why don't you just fire me."  Seville allegedly responded with, "get [your] black ass out of the office."  *Id.* at 121-22.  Seville used the "black ass comment" in front of plaintiff on more than two occasions.  *Id.* at 172.  Also, plaintiff testified that Seville used racial slurs a few times, and he learned that Seville had used the "N-word" in reference to him at least in front of fellow employees (but apparently not in plaintiff's presence) while at a bar frequented by UPS employees after work.  Henderson Depo. at 170-72.

On September 23, 2003, Seville phoned plaintiff and they had an apparently unfriendly discussion in regard to service failures in his area.  The phone conversation ended with plaintiff informing Seville that he was going to report her to human

---

[3]   The defendant has submitted eviscerated excerpts from the transcript of plaintiff's deposition under at least two separate parts of Tab A to its brief, and plaintiff has submitted other eviscerated and sometimes duplicative excerpts as three different parts of Exhibit 1 to his response, thus making location of cited pages and citation to them particularly cumbersome.  The Court will hereafter cite only to the page number of the deposition transcript ("Henderson Depo.") which was obtained in its entire whole form from the parties by a separate order, (*see* Dkt. ## 88, 89) without regard to whether the page is attached to Defendant's Motion or Plaintiff's Response.

resources.  After Seville and plaintiff got off the phone, Seville subsequently approached plaintiff, yelling and screaming, and asked, "What the fuck are you going to human resources for?"  *Id.* at 167.  Plaintiff began to walk away from Seville while she was confronting him, and Seville allegedly grabbed Mr. Henderson's arm.  *Id.* at 178.  Plaintiff testified that Seville grabbed his arm with enough force to make it sore.  *Id.* at 179.

In addition to these specific instances, plaintiff also claims that he was generally harassed by Seville on a daily basis in ways including yelling, cursing and disrespect, but does not provide any specifics about the nature of the daily harassment.  *Id.* at 164, 174.  On December 3, 2003, plaintiff filed a charge of employment discrimination with the EEOC, in which he stated that he was subjected to harassment and he referenced the above incidents.  *See* Exhibit L to Defendant's Motion.  He stated in the charge that his manager had transferred him from the Northwest Wall to the South Wing, which forced him to work in a new and unfamiliar area involving more difficult work.  *Id.*

Henderson also attempts to support his hostile work environment claim through the affidavits of two African-American co-workers, Russell Pope and Emery Lewis, who attest to various coarse conduct by Seville although not clearly indicative of racial animus.  In any event, there is no evidence that plaintiff witnessed or was aware of Pope and Lewis' interactions with Seville.  A plaintiff cannot subjectively perceive behavior towards others as creating a hostile work environment unless he knows about the behavior.  *See Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995).  Thus the Pope and Lewis affidavits do not directly support plaintiff's

11

hostile work environment claim.  Similarly, plaintiff's own unsupported and nonspecific conclusory allegations of "daily harassment" do not create a genuine issue of material fact.

The issue is whether these claimed racially-charged comments and ridicule by Seville, which allegedly spanned a period of ten months, were so severe and pervasive that they could have altered the conditions of plaintiff's employment.[4]  Defendant characterizes these incidents as lacking the requisite level of severity or pervasiveness, but the Court does not agree.  These comments collectively, viewed in a light most favorable to plaintiff's claims, appear to be more than isolated, sporadic or insubstantial.  It appears that Seville's general hostility towards plaintiff manifested itself somewhat regularly in racially hostile overtones, which may well have had the effect of altering plaintiff's work environment.  When viewed in the totality of the circumstances, Seville's alleged comments and conduct were arguably sufficiently severe and pervasive enough to establish a *prima facie* case of racially hostile work environment.

However, even assuming the alleged workplace conduct creates an environment that would be found to be hostile and abusive due to harassment, whether the

---

[4] Plaintiff suggests that the inquiry into whether conduct is severe or pervasive enough is not appropriate at the summary judgment stage (Response at 17).  The Tenth Circuit has, however, repeatedly affirmed summary judgments entered on grounds that the hostile work environments in question were not severe or pervasive as a matter of law.  *See e.g. Mackenzie v. City and County of Denver*, 414 F.3d 1266, 1280-81 (10th Cir. 2005).

employer is liable under Title VII is a separate question.[5]  In *Meritor Savings Bank, FSB, v. Vinson*, 477 U.S. 57, 66 (1986), the Supreme Court declined to issue "a definitive rule on employer liability," but did state that it agreed with the EEOC "that Congress wanted courts to look to agency principles for guidance in this area."  477 U.S. at 72.  Pointing out that the definition of "employer" in Title VII included any "agent" of an employer, the court observed that the statute "surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible."  *Id.*  The Supreme Court went on to reject the ruling entered by the appellate court in that case that "employers are always automatically liable for sexual [or racial] harassment by their supervisors."  *Id.* at 73.

In *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998), the Tenth Circuit described the basis for employer liability was as follows:

> "Under this theory of employer liability, the plaintiff must establish that the employer had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment."  *Harrison v. Eddy Potash, Inc.*, 112 F.3d 1437, 1444 (10th Cir.) . . . .  This is not derivative liability according to the doctrine of *respondeat superior*, but direct liability for negligence.  *See Hirschfeld,* [*v. New Mexico Corrections Dept.*] 916 F.2d [572] at 577 n. 5 [10th Cir. 1990].  Because an employer is only potentially liable for negligence in remedying and preventing harassment of which it negligently failed to discover, courts must make two inquiries: first, into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative

---

[5]   Liability for hostile work environment under 42 U.S.C. § 1981 is measured by the same test as under Title VII.  *See e.g. Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998); *Paris v. Southwestern Bell Telephone Co.*, 2004 WL 790299 at **3 (10th Cir. April 14, 2004).

responses to any actually or constructively known
harassment.

144 F.3d at 673.  Accordingly, this Court applies the two-part inquiry set forth in *Adler.*

There appears little doubt in the instant case that plaintiff made defendant aware

of at least some of his claims that he was being racially harassed by Seville.  Plaintiff

testified that after at least the first and third incident when Seville turned off the lights,

he complained to Joe Gonzalez, a hub manager.  Henderson Depo. at 80-83.  After the

incident in September 23, 2003, plaintiff testified that he contacted defendant's human

resources department and left a message of complaint, and left a message with Greg

Pietrek, a divisional supervisor.  *Id.* at 183-84.  And on October 2, 2003, plaintiff called

the UPS help line and formally complained of alleged racial discrimination, hostile work

environment, and the alleged physical assault.  Indeed, defendant does not appear to

deny knowledge of some of these the incidents involving Seville.  Rather, it argues that

it took prompt and corrective actions regarding Seville's behavior and that such steps

were reasonable and effective (Defendant's Reply at 12).

An employer is absolved of liability for acts of harassment by its employees if

it undertakes remedial and preventative action "reasonably calculated to end the

harassment."  *Adler,* 144 F.3d at 676; *see also Ford v. West,* 222 F.3d 767, 776 (10th

Cir. 2000).[6]  Examples of appropriate remedial and preventative action include prompt

investigation of the allegations, proactive solicitation of complaints, scheduling changes

---

[6]  While *Adler* addressed sexual harassment, the Tenth Circuit stated in *Ford* that "our
cases have always reflected a belief that the employer-liability standards are equivalent for
race and sex-based discrimination." 222 F.3d at 776 n.8 citing *Wright-Simmons v. City of
Oklahoma City*, 155 F.3d 1264, 1270 (10th Cir. 1998).

and transfers, oral or written warnings to refrain from harassing conduct, reprimands, and warnings that future misconduct could result in progressive discipline, including suspension and termination. *Adler*, 144 F.3d at 676. The reasonableness of the employer's response to any harassment about which it knew or should have known also must be considered. *Ford,* 222 F.3d at 776. To constitute a reasonable response, the employer's remedial and preventative action must be reasonably calculated to end the harassment. *Id.*

Here, the record shows that when plaintiff complained to management about Seville's specific conduct, UPS took effective action to remedy and address plaintiff's concerns. It appears that the first time Henderson complained about Seville was in regard to the incidents in the spring of 2003 in which Seville would turn off the lights say, "Where are you Brad? I can't see you." After plaintiff complained to hub supervisor Gonzalez a second time, Seville's "lights out" routine apparently stopped. Henderson Depo. at 81-83. A stoppage of harassment shows effectiveness, which in turn evidences a reasonable response. *Adler,* 144 F.3d at 676.

Although Seville thereafter allegedly told plaintiff to get his "black ass" out of her office and allegedly referred to plaintiff by the "N-word" at a bar, there is no indication that these incidents were reported to defendant.

When plaintiff did complain to defendant about Seville's alleged assault upon him, the defendant took quick responsive action. Plaintiff himself alleges in his amended complaint that the defendant commenced an investigation on September 25, 2003, and transferred Seville to another position (Amended Complaint at ¶ 34).

15

He testified in his deposition that Seville was reprimanded and disciplined, including being counseled, suffering a reduction in her bonus, and being transferred out of the night hub where plaintiff worked to a day shift where plaintiff would not have to deal with her on the job.  Henderson Depo. 199-200; 203-04.  The record also reflects that Seville was required to sign off on a write-up of the incident in which she acknowledged that she could be terminated for such conduct and agreed to seek counseling for anger management and conflict resolution.  *See* Exhibit 9 to Plaintiff's Response.  Plaintiff testified that after Seville was transferred, he did not have "any further problem" with her.  Henderson Depo. at 206.  Defendant's reprimand of Seville and her transfer were thus effective in remedying the problems between Seville and plaintiff.[7]

Having taken reasonable, prompt and effective action to end the harassment being carried out by the hub supervisor, the defendant discharged its responsibility under Title VII.  Plaintiff appears to suggest that even after Seville was relocated, he continued to have "problems from the incident" stemming from coworkers treating him like a whistleblower (Plaintiff's Response at 8; Henderson Depo. at 206-07).  However, as the Tenth Circuit panel stated in *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1269 (10th Cir. 2005), coworker hostility or retaliatory harassment may be an adverse employment action for purposes of a retaliation claim if it is sufficiently severe.  But

---

[7]   Plaintiff suggests that Seville's transfer to the day shift was not effective because it simply had the effect of transferring her hostility towards the day workers' environment (Plaintiff's Response at 18).  Even if plaintiff has standing to raise the claims of other employees, the affidavit cited by plaintiff does not provide specific evidence of a *prima facie* case of a racially hostile work environment on the day shift (*see* Affidavit of Emery Lewis, Exhibit 7 to Plaintiff's Response, at ¶¶ 11-18).

coworker hostility not demonstrated to be based on racial animus, and not reported to the employer as was the case here, cannot be the basis for a racial harassment claim.

Accordingly, for the reasons set forth above, the Court finds that there are no material facts in dispute regarding plaintiff's claim of hostile work environment and racial harassment in violation of Title VII and 42 U.S.C. § 1981 that prevent the entry of summary judgment for defendant, and therefore such judgment must be entered as to plaintiff's first claim for relief.

### B.    Plaintiff's Claims of Retaliation

Title VII bars employers from retaliating against an employee for engaging in a "protected activity."  42 U.S.C. § 2000e-3(a).  An employee engages in a protected activity when he "has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing . . . .  *Id.*  Title VII's definition of protected activity is broad enough to include informal as well as formal complaints.  *See Love v. RE/MAX of Am., Inc.,* 738 F. 2d 383, 387 (10th Cir. 1984).

The burden-shifting framework of *McDonnell Douglas* applies to Title VII retaliation claims.  *McGarry v. Board of County Comm'rs of Pitkin Co.*, 175 F.3d 1193, 1201 (10th Cir. 1999).  A plaintiff can satisfy the requirements for a *prima facie* case of Title VII retaliation by showing that (1) he engaged in protected activity, (2) there was an adverse employment action, and (3) there is a causal link between the protected activity and the adverse action.  *Sanchez v. Denver Public Schools*, 164 F.3d 527, 533 (10th Cir. 1988).

Although the Tenth Circuit liberally defines an "adverse employment action," its existence is determined on a case-by-case basis and does not extend to a mere inconvenience or an alteration of job responsibilities.  *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 857 (10th Cir. 2000).  To be an adverse action, the employer's conduct must be "materially adverse" to the employee's job status, *Wells v. Colorado Dept. of Transp.*, 325 F.3d 1205, 1213 (10th Cir. 2003), or cause public humiliation or harm to future employment prospects, *Berry v. Stevenson Chevrolet,* 74 F.3d 980, 986-87 (10th Cir. 1996).  Excluded from that definition are those acts that merely have a *de minimis* impact upon an employee's future job opportunities.  *Hillig v. Rumsfeld,* 381 F.3d 1028, 1033 (10th Cir. 2006); *Aquilino v. Univ. of Kan.*, 268 F.3d 930, 934 (10th Cir. 2001).

Plaintiff's retaliation claims, contained both in the second and sixth counts of the Amended Complaint, appear to rest on the following four incidents each of which plaintiff asserts amounted to an adverse employment action: (1) being placed on paid leave for five days in December 2003 pending an investigation of the workplace dispute relating to the "turkey incident" and being required to sign off on a revised "write-up" of the incident (Plaintiff's Count II); (2) denial of a request for lateral transfer in June 2004; (3) refusal of an invitation to the UPS Board of Directors luncheon in August 2004; (4) denial of access to UPS facility while on medical leave in August 2004 (Plaintiff's Count VI).  Because these claims arose at different times and in different contexts, the Court separately analyzes the retaliation claims.

1.      Paid Suspension and Write-Up

It appears that in connection with this alleged act of retaliation defendant does

not dispute that plaintiff engaged in "protected activity," as he called the UPS help line

on October 2, 2003 and allegedly complained of racial discrimination, and on

December 3, 2003 he filed a charge of discrimination with the EEOC.  Moreover,

although plaintiff has not offered any specific evidence demonstrating that the

management at UPS was aware of his filing of the EEOC charge on December 3, 2003

or his October 2003 help line complaint at the time he was placed on paid suspension

on December 12, 2003, it does not appear that defendant argues there was a lack of

causal connection between the protected activity and the employer conduct.  Rather,

defendant asserts that the paid suspension and related acts do not constitute "adverse

actions." (Defendant's Reply Brief at 17-19).

Viewing the evidence in a light most favorable to the plaintiff as the Court must

do on this motion, it appears that on December 10, 2003 UPS employees were handing

out company-provided holiday turkeys at the guard shack to employees that were

exiting the facility.  As employees left the building, they exchanged coupons bearing

their names and their supervisor's names for a free holiday turkey.  Affidavit of Gregory

Pietrek, Tab C to Defendant's Motion, at ¶ 5.  Plaintiff apparently turned in a blank

coupon for a turkey to Lori Chamberlain, the employee in charge of the turkey

distribution.  Chamberlain told plaintiff that his name had to be on the coupon in order

to redeem the turkey.  Plaintiff and Chamberlain argued about whether or not the

employee's name needed to be on the coupon.  Henderson Depo. at 268-69.  Plaintiff

sought out supervisor, Joe Gonzales, and had Gonzales put his name on a new coupon. Plaintiff returned to Chamberlain and presented to her a coupon with his own name on it, although he continued to argue with her over whether it was required that the name appear on the coupon. Henderson Depo. at 272-73.

Chamberlain subsequently reported to Pietrek that she felt intimidated and threatened by plaintiff and that he had acted in a hostile manner. Pietrek Affidavit at ¶ 6. On December 12, 2003, plaintiff was placed on paid suspension pending investigation of Chamberlain's complaint. Henderson Depo at 275-76; Pietrick Affidavit at ¶ 6. On December 17, 2003, plaintiff's suspension ended and he was returned to service. Pietrick Affidavit at ¶ 6; Henderson Depo at 276. Plaintiff alleges that as a condition of his return to service he had to "redraft a written statement eliminating any accusations of racial bias on the persons involved in the 'turkey incident'" Amended Complaint at ¶ 43.

Plaintiff contends that the December 2003 suspension amounted to a retaliatory adverse employment action because it was humiliating, damaged his reputation, and exposed him to stereotype ridicule. Plaintiff's Response at 20-21. Plaintiff also claims that as a result of the "turkey incident," he was subjected to discipline in the form of the "write-up." *Id.* at 21, 26. The write-up carried a warning that another incident could lead to termination. Exhibit 8 to Plaintiff's Response. Plaintiff asserts that this write-up had an impact on his future employment because with another incident he could be fired. *Id.* Plaintiff's Response at 26.

The Court first finds that plaintiff has failed to establish that his five-day suspension was an adverse action for purposes of his retaliation claim.  Plaintiff received full pay during the five days.  He did not suffer any loss of compensation, or any change in the benefits or employment status he held before the suspension. Henderson Depo. at 276.  When asked if he suffered any discipline as a result of the incident, plaintiff replied that he was "emotionally scarred," but he did not identify any specific adverse employment action.  *Id.* at 280.  He does not demonstrate that the suspension actually has affected adversely his future employment prospects.  Thus, at most this had a *de minimis* effect on plaintiff and did not amount to an adverse employment action.

On the other hand, the so-called write-up (Exhibit 8 to Plaintiff's Response) could potentially have an effect on plaintiff's future employment prospects with UPS, at a minimum, or with another employer, even though plaintiff offered no evidence that such write-ups are made known to inquiring potential employers.[8]  Such a write-up can be considered an adverse action.  *See Medina v. Income Support Div., New Mexico,* 413 F.3d 1131, 1137 (10th Cir. 2005) ("Disciplinary proceedings, such as warning letters and reprimands, can constitute an adverse employment action."); *Roberts v. Roadway Exp., Inc.,* 149 F.3d 1098, 1104 (10th Cir. 1998) (written warning is adverse action because "the more warnings an employee received, the more likely he or she

---

[8]   In *Hillig v. Rumsfeld, supra*, the Tenth Circuit rejected the argument that "adverse action" stemming from a negative employer reference required the plaintiff in a Title VII case to show that negative references actually "caused or contributed to the rejection by a future employer." 381 F.3d at 1034-35.

was to be terminated for a further infraction."); *Ochoa v. Swift & Co.*, 2006 WL 1305197 (D. Colo., May 9, 2006) ("A reprimand adversely affects the terms and conditions of a plaintiff's employment if it, among other things, affects the likelihood that the plaintiff will be terminated or undermines the plaintiff's current position," citing to *Medina, supra.*)

Although the write-up allegedly required of plaintiff begins innocuously with an acknowledgment by plaintiff that he is aware of the defendant's business code of conduct, it continues with express statements by plaintiff that he will treat each employee with respect and dignity, refrain from using profanity and yelling at employees, make sure that he is an arm's length away from each individual, make sure that they are "free of threats and any forms of intimidation from myself and others." (Exhibit 8 to Plaintiff's Response).  While the write-up does not explain the background that led to its preparation, or expressly state that plaintiff had engaged in the conduct from which he is agreeing to refrain, the implication is that he had engaged in such conduct.  Yet, there is no explanation as to how this incident came about.  Forcing plaintiff to make such an acknowledgment, coupled with the last sentence which states "[f]ailure to comply with the above issue can and will lead to disciplinary action up into termination," may be viewed as an adverse employment action by the employer that could harm plaintiff's future employment prospects with defendant, or potentially with another employer.

Defendant appears to argue that it had a legitimate nondiscriminatory reason for temporarily suspending plaintiff while it investigated the "turkey incident" involving co-employee Ms. Chamberlain, particularly because there was a corroborating witness

(Reply Brief at 16).  The Court does not disagree with that proposition, but that does not explain or justify the so-called write-up as being a legitimate, nondiscriminatory act. After all, given that plaintiff was restored to his position with full pay and no change in benefits, it is unclear why the write-up was necessary to be put in plaintiff's employment file.  Defendant may have a legitimate, nondiscriminatory and nonretaliatory reason for requiring the "write-up."  But, on the present state of the record, a jury could find that requiring plaintiff to sign the write-up, if in fact that is what occurred under the circumstances claimed, was an act of retaliation.  It may well be that other UPS employees have been required to execute such write-ups when they are involved in disciplinary matters, but that fact does not conclusively refute the possibility that in this instant case plaintiff was required to execute the write-up out of a retaliatory motive.

     2.   <u>Denial of Lateral Transfer</u>

On January 26, 2004, plaintiff filed a second charge of employment discrimination with the EEOC.  Exhibit M to Defendant's Motion.  He states in that charge that he believed the December suspension was discriminatory and retaliatory. On March 22, 2004, plaintiff wrote to Cal Darden, a member on UPS' Board of Directors, complaining of race discrimination.  Exhibit 12 to Plaintiff's Response.

On June 1, 2004, plaintiff applied for a transfer to a North Carolina facility operated by defendant, stating on the transfer request form that the reason for the transfer was "personal."  *See* Amended Complaint at ¶ 66; Exhibit J to Defendant's Motion.  A notation on the transfer request form dated July 9, 2004 indicates that the transfer was "denied."  *Id.*  Plaintiff alleges that the refusal to transfer him to North

Carolina was retaliation for his having filed a charge with the EEOC and having complained to management about perceived discrimination. *See* Amended Complaint at ¶ 70. Again, defendant does not dispute that plaintiff had engaged in protected activity, but it does argue that denial of plaintiff's transfer request does not constitute an adverse employment action, and that plaintiff failed to establish a causal connection between the protected activity and the employer's action (Defendant's Motion at 17-20).

While most cases addressing whether an employer's action is an adverse action deal with situations where the employee is involuntarily transferred, the decision in *Sanchez v. Denver Public Schools*, 164 F.3d 527 (10th Cir. 1998), specifically addresses also the situation where the employee claims the retaliation came in the form of a denied transfer, as is the case here. *Sanchez* expressly holds that denial of a transfer to a position that would have paid the same salary and benefits, and involve substantially the same duties, is not an adverse employment action in the context of a retaliation claim.

The plaintiff in *Sanchez* sought the transfer to another position to get away from a hostile supervisor. She alleged discriminatory retaliation when the transfer was denied. The Court found that the position Sanchez sought "would have been a purely lateral transfer for Ms. Sanchez involving at most an insignificant alteration in job responsibilities." *Id*. Therefore, even though "Sanchez obviously viewed the change as a positive one, under the law cited above, and in the unique circumstances of this case, her failure to receive the position was not an adverse employment action . . . ." *Id*. The Tenth Circuit panel added that "[i]f a transfer is truly lateral and involves no

significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer adverse employment action." *Id.* at n.6.

Thus, even though plaintiff in the instant case testified that he wanted the transfer to North Carolina to "get a fresh start," and may have desired the transfer to get away from what he perceived as an unfriendly work environment in Denver while remaining with UPS (*see* Henderson Depo. at 219), the denial of the lateral transfer cannot be found to be an adverse employment action under the ruling of the *Sanchez* case.  Therefore, the Court need not address whether the employer denied the transfer for a valid reason or not, as this asserted retaliation claim lacks an essential element. Although not alleged in his Amended Complaint as an act of retaliation, plaintiff argues in his motion that he was denied a transfer from "outbound to inbound [service] in retaliation for his complaint against Seville."   Plaintiff's Response at 10.  Plaintiff testified in his deposition that this would be a "lateral move" and not a "promotion." Henderson Depo. at 291-92.  Thus for the same reasons set forth herein this claimed transfer denial does not amount to an adverse employment action as a matter of law.

> 3.    Refusal to Extend an Invitation to Directors' Luncheon and Denial of
>        Access to the UPS Facility

Plaintiff also claims that defendant's denial of access to the UPS facility and the Board of Directors' luncheon constitute adverse actions.  As discussed above, to be an adverse action, the employer's conduct must be "materially adverse" to the employee's job status, or cause harm to future employment prospects.  Excluded from that

definition are those acts that merely have a *de minimis* impact upon an employee's future job opportunities. See *Wells, Berry, Hillig, Aquilino, supra.*

Plaintiff here has not alleged, or demonstrated in any way by deposition testimony or otherwise, that not being invited to the Directors' luncheon caused any change in his job or benefits status, or harmed his future employment prospects. Accordingly, this incident was not an adverse employment action that supplies a basis for a retaliation claim.

Similarly, plaintiff has not demonstrated, nor even alleged, any facts that support the conclusion that denial of entry into the UPS facility was an adverse employment action, or caused harm to his future employment prospects.  The facts relating to this incident, viewed in a light most favorable to the plaintiff, indicate that in August of 2004, while plaintiff was on a medical leave of absence from UPS, his name was placed on security list that prohibited him from entering the plant (Amended Complaint at ¶ 72). Plaintiff avers that on August 22, 2004, he was denied entry to the plant and was told that it was because he was on medical leave, yet other employees on medical leave are not denied entry to the plant (*id.* at ¶ 73).

Defendant responded by way of an affidavit from its security manager explaining that it was UPS policy to deactivate the security badges of employees on leave, and the employee is not allowed in the building without an appointment (Affidavit of Rick Jewert, Tab K to Defendant's Motion, at ¶ 3).  The affidavit further states that plaintiff attempted to enter the UPS facility on August 21, 2004, which was over a weekend, and contacted Jewert, UPS's Security Manager, to say he need to "retrieve something

out of a briefcase in his office."  (*Id.* at ¶ 2).  Jewert advised plaintiff that he could not allow him to enter the building without an appointment, but that if he made an appointment he would let him in at a later time (*id.* at ¶ 3).

Although plaintiff takes issue with whether or not the defendant had a written policy regarding limiting access to the plant (Plaintiff's Response at 30), plaintiff does not expressly controvert any of the other statements contained in the Jewert affidavit regarding allowing him access at a later time.  *See* Henderson Depo at 285-89. Plaintiff apparently did not schedule an appointment at a later time to enter the plant, and perhaps based on Jewert's uncontroverted assertion that plaintiff said he was seeking access because his lawyer had instructed him to do so, plaintiff was not genuinely seeking access to the plant.  In any event, even if defendant did not have a policy restricting access and plaintiff should have been permitted to enter the plant without an appointment, he has failed to establish more than a *de minimis* adverse consequence and this incident is not enough to support a retaliation claim under Title VII.

In summary, all the retaliation claims set forth in plaintiff's sixth claim are subject to dismissal.  The retaliation claims set forth in plaintiff's second claim are subject to dismissal, with the exception of the claim relating to plaintiff being required to sign off on the so-called "write-up."

**C.    Plaintiff's Claims of Racial Discrimination in Conditions of Employment**

In order to establish a prima facie case of employment discrimination either under Title VII or under 42 U.S.C. § 1981 based on disparate racial treatment, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) the adverse action occurred under circumstances which give rise to an inference of unlawful discrimination. *Kenderick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1225-27 & n.4 (10th Cir. 2000) (noting that the analytical framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) applies to Title VII claims as well as to claims brought under § 1981); *see also Hysten v. Burlington N. and Santa Fe Ry. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002).

Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *McDonnell Douglas,* 411 U.S. at 802.  At the summary judgment stage it then becomes the plaintiff's burden to show that there is a genuine issue of material fact as to whether the employer's proffered reason for the challenged action is "unworthy of belief," thus pretextual. *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995).  If plaintiff succeeds both in making out a *prima facie* case and in showing that defendant's proffered reasons are pretextual, plaintiff's claim will withstand summary judgment. *Id.*

While plaintiff's Amended Complaint asserts generally in Count III that plaintiff was subjected to racial discrimination in the conditions of his employment in violation of

Title VII and 42 U.S. § 1981, the only employer action specifically alleged in that count is that plaintiff was denied the same office accommodations as white supervisors because he was assigned to a converted mop closet with visible electric wiring (Amended Complaint at ¶¶ 49-50).  In his opposition to the defendant's motion, plaintiff asserts that there were "numerous adverse actions based upon race" including those described above as retaliatory and indicative of a hostile racial environment (Plaintiff's Response at 19-20).  However, his brief only enumerates four such alleged discriminatory acts: (1) being segregated from other white supervisors by having his office placed in a converted mop closet; (2) being placed on suspension after the "turkey incident" when such discipline was not administered to Seville after she "assaulted" plaintiff; (3) being ridiculed by co-workers after the "turkey incident;" and (4) Seville's undermining of his authority as a supervisor, which was not inflicted on white supervisors (Plaintiff's Response at 20-21).

Defendant asserts that plaintiff has failed to make out a prima facie case of racial discrimination because these allegations do not amount to adverse employment action required under the second prong of the *McDonnell Douglas* framework (Defendant's Motion at 13-15; Reply Brief at 13-17).  Alternatively, defendant argues that it has offered legitimate, nondiscriminatory reasons for its actions and plaintiff fails to show that its reasons are pretextual (Defendant's Motion at 15-17).

Plaintiff contends that the employer's actions constitute adverse employment actions.  Echoing his position with regard to his claim of retaliation, he relies on *Sanchez, supra,* and *Berry, supra,* in maintaining that the Tenth Circuit defines an

adverse employment action liberally and not limited to situations where the plaintiff can show monetary losses in the form of wages or benefits or loss of an actual job (Plaintiff's Response at 19).  Rather, he correctly points out, the Tenth Circuit has stated that adverse employment actions may encompass those acts that carry "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects."  *Berry, supra*, 74 F.3d at 986.

The Court has already found that the brief suspension with pay and the alleged followup treatment by fellow employees did not amount to an adverse action supporting a retaliation claim, and the same can be said as to plaintiff's claim of discrimination in the conditions of employment based on these events.

However, as the Court has also already found, requiring plaintiff to acknowledge the "write-up" in connection with his five-day suspension was an adverse action, as it could adversely affect future employment prospects at least within UPS.  Although the defendant appears to argue that plaintiff was disciplined no more harshly in connection with that incident than Seville was for the alleged assault on plaintiff, the Court notes a possible qualitative difference in the two "write-ups" of each employee.  *Cf.* Exhibits 8 and 9 to Plaintiff's Response.  Unlike plaintiff's write-up, Seville's write-up sets forth both the context in which the incident arose, and her position that she did not assault plaintiff but only touched his arm to gain his attention.  There may well be a nondiscriminatory reason for the difference, but it is not presently before the Court.

Similarly, assigning plaintiff to a converted broom closet for an office when other white supervisors had an office may be indicative of racial discrimination.  *See e.g.*

30

*Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742, 744 (7th Cir. 2002), *cert. denied* 540 U.S. 984 (2003) (adverse action may be found in "[c]ases in which the employee is not moved to a different job or the skill requirements of his present job altered, but the *conditions* [emphasis in original] in which he works are changed in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment – an alteration that can fairly be characterized as objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet."  Even though plaintiff testified in his deposition, as defendant correctly states, that the decision by the two supervisors to house him in a closet was a "poor management decision" (Henderson Depo. at 97-98), he also testified that he was "singled out and put in a mop closet" where he was unable to conduct meetings and that he was "isolated from everybody else" (Henderson Depo. at 97-100).  This conduct, imposed on a person in the position of a supervisor by his superior, may well be found by a jury to be a sufficiently adverse action to satisfy the second prong of the *McDonnell Douglas* test.

The Court has also found some of the conduct of plaintiff's immediate boss, Ms. Seville, arguably evidenced severe and pervasive racial animosity towards plaintiff.  Even if such conduct does not ultimately support a claim for a hostile racial environment because the employer transferred her away from plaintiff, and therefore avoids direct liability, plaintiff nonetheless endured Seville's racial hostility while she supervised him.  Under Title VII, it is, of course, the employer who is liable for the discrimination in the conditions of employment, not the supervisor. *See e.g. Haynes v.*

*Williams,* 88 F.3d 898, 899 (10th Cir. 1996) (supervisor operates "as the alter ego of the employer, and the employer is liable for the unlawful employment practices of the individual without regard to whether the employer knew of the individual's conduct.")

Moreover, separate and apart from the racial epithets, plaintiff asserts that Seville engaged in actions that undermined his authority as a supervisor, while not raising such matters with white supervisors (*See* Henderson Depo. at 109-10; 113; 115-17). Such disparate treatment may constitute an adverse employment action insofar as it affects a supervisor's performance.

The Court finds that notwithstanding the limited allegations in his Amended Complaint, the plaintiff has come forward with enough evidence of adverse employment actions taken in the course of his employment as a UPS supervisor to withstand summary judgment, and permit the jury to decide if these employment actions were indeed adverse, were indicative of racial discrimination and whether they caused any compensable damage to plaintiff.

The Court need not address here defendant's assertion that plaintiff has failed to show that its reasons for the above-described actions are pretextual (Defendant's Motion at 15-17) because the defendant has not met its burden to come forward with legitimate, nondiscriminatory reasons for requiring the write-up, assigning plaintiff to a mop closet for an office, or treating his supervisory activities differently from white supervisors, if indeed that occurred. The Court simply finds no explanation in defendant's motion or reply brief that attempts to explain these actions.

Accordingly, a jury must decide if defendant engaged in discriminatory employment conduct with respect to the above matters, or whether it had legitimate nondiscriminatory reasons.

### D.     Plaintiff's Common Law Battery Claim

Defendant argues that the Colorado Workers' Compensation Act ("CWCA") provides the exclusive remedy for all injuries "arising out of and in the course of an employee's employment."  C.R.S. § 8-41-301(1)(c).  Plaintiff contends that his state law claim for battery is not preempted by the CWCA, citing to *Horodyskyj v. Karanian*, 32 P.3d 470 (Colo. 2001) (Plaintiff's Response at 31-33).   The Court agrees that *Horodyskyj* provides the authority for deciding this argument, but not in favor of plaintiff.

As *Horodyskyj* holds, the phrases "arising out of" and "in the course of" are not synonymous.  A workers' compensation claim must meet both requirements to be covered by the CWCA.  32 P.3d at 475, citing *Younger v. City & County of Denver*, 810 P.2d 647, 649 (Colo. 1991).  An injury occurs "in the course of" employment when it takes place within the time and place limits of the employment relationship and during an activity connected with the employee's job-related functions.  *Horodyskyj*, 32 P.3d at 475.  Here, plaintiff's state law battery claim is based on Seville allegedly grabbing his arm.  There is no dispute that the incident occurred on UPS premises during working hours.  Thus, the alleged battery was clearly within the time and place limits of the employment relationship, during an activity connected with the employee's job-related functions, and thus it occurred in the course of employment.

33

An injury "arises out of" employment when it has its origin in an employee's work-related functions and is sufficiently related to those functions to be considered part of the employee's employment contract.  *Popovich v. Irlando*, 811 P.2d 379, 383 (Colo. 1991.)   As explained in *Horodyskyj, supra,* 32 P.3d at 475, whether a workplace assault arises out of the employment depends on which of three categories the assault falls into.  Those assaults that have an inherent connection with the employment, or those assaults that are neutral, arise out of employment for purposes of workers' compensation coverage and therefore an employee may not sue his employer in tort for such assaults.  Only those assaults that are inherently private are not covered by the Act and permit tort claims against an employer.  *Id.*

*Horodyskyj* further held that assaults that have an inherent connection to employment include assaults originating in arguments over work performance, work equipment, delivery of a paycheck or termination from work.  *Id.* at 476.  In the instant case, there is no dispute that the confrontation between plaintiff and Seville was "about job performance."  Henderson Depo. at 306.  Plaintiff testified that the incident resulted from his workplace argument with Seville over job issues and his threat to report her to the Human Resources Department.  *Id.* at 178.  He also admitted that his relationship with Seville was exclusively work-related.  *Id.* at 306.  Given these facts, the alleged assault had its origin in an employee's work-related functions and thus arose out of plaintiff's employment with UPS.  Plaintiff's Count IV, alleging employer liability for assault, is thus preempted by the CWCA.

34

### E.     Plaintiff's Common Law Negligent Supervision Claim

Plaintiff's fifth claim against defendant for negligent supervision appears to be based entirely on actions allegedly taken by of Seville, including the alleged assault discussed above.  As with his assault claim, plaintiff here seeks to impose liability on the employer for work related injuries imposed by his supervisor.  The claim does not allege any nonwork-related injuries.

As the Court said in *Horodyskyj*, the CWCA provides the "exclusive remedies for employees suffering work-related injuries . . . ."  32 P.3d at 474.  These exclusive remedy provisions bar claims in tort against the employer, and the employer is granted immunity from common law actions for damages.  In exchange for the certainty and relative speed of the workers' compensation system, an employee surrenders the right to sue his or her employer in tort and the employer surrenders its defenses to such suit. *Id.*  Plaintiff here may well have a remedy against defendant for the alleged wrongful conduct of Seville, but that remedy does not lie in a tort claim against the employer. Plaintiff's Count V, alleging negligent supervision, must be dismissed.

## VI.    CONCLUSION

For the reasons stated above, the Court GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment (Dkt. # 50).

The motion is granted in its entirety as to Counts I, IV, V, and VI of Plaintiff's Amended Complaint, and those claims are dismissed with prejudice.

The motion is denied, in part, as to Counts II and III of Plaintiff's Amended Complaint to the extent that Count II alleges retaliation in connection with the "write-up"

35

required of plaintiff after his five-day suspension, and to the extent Count III alleges discrimination in the conditions of employment relating to plaintiff's office, undermining his supervisory authority, and requiring a "write-up" after his five-day suspension.

Summary judgment is granted as to the other claims of retaliation alleged in Count II and any other acts of discrimination alleged in Count III.

DATED: June 7, 2006

BY THE COURT:

*s/ Phillip S. Figa*

_____
Phillip S. Figa
United States District Judge